v. Walker. Mr. Adler, good to see you. Please come speak with us. Good morning. May it please the Court, Andrew Adler from the Federal Defender's Office on behalf of Edward Walker. Account 1 in this case represents an unprecedented expansion of sex trafficking by coercion under 1591. Our fundamental submission in this case is that coercion does not exist as a matter of law where, as in this case, there are viable alternatives to prostitution that are readily available. And I want to start with the text of the statute because that is critical to our argument here and then turn to the facts of this case. Congress did not leave the term coercion undefined. It enacted a very specific definition with a heightened standard that really is akin to duress. Coercion is defined in terms of serious harm or physical restraint. Now, physical restraint is not alleged in this case, but it's instructive because when somebody is tied up or locked up in a hotel room, they have no viable alternative. And that same understanding is incorporated into the serious harm definition in 1591E5, which is harm that is so sufficiently serious that a reasonable person in the victim's circumstances... Now, the harm could be psychological or emotional harm. That's correct, but it must be so serious that a reasonable person in the victim's circumstances would be compelled to engage in prostitution. Compelled is the key word there. There's not a single appellate court anywhere... Do you have to show actual coercion counsel? Your Honor, you have to show that they're not necessarily... Wait. What does the statute say? What's that element that you're referring to say? It depends on which version of coercion I think you're traveling under, but it intended... Any version that you'd like to talk about, but you don't actually have to prove coercion, do you? Correct. I believe that the defendant has to engage in some conduct that intends to exert... The defendant has to know that coercion will be used to have the victim engage in commercial sex activities, correct? Yes, that's correct. So, if the government could show that the defendant here knew that coercion would be used, whether coercion was actually used or not, that would be sufficient, would it not? Yes, Your Honor. Okay. Let's talk about the evidence then, if we don't have that understanding. Because it seems to me that there was a breadth of social media indications of what the intent of the defendant was going into this. Not what actually happened that day or the day before or the day before, but intent on what we were going to do and what his business was. Your Honor, we're not disputing his intent in this case. What we're disputing is that... His knowledge about what was going to happen. Your Honor, if he had knowledge that if he intended or knew that when they got to Miami, that he would take her phone or that he would cut off her communication with the outside world, which is what happens in these paradigmatic coercion cases like Purcell from the Second Hotel Room, then I would agree... What about knowing that she was going to put her in a state of a choice of you're going to starve or go hungry or not have a place to sleep or engage in this activity? What about that? Perhaps, but that is not what we think happened here because she was on her phone the entire time. That goes to what actually happened, and that's why I think the distinction is important here. Because whatever actually happened doesn't seem to be what the statute is directed at. What the statute seems to be directed at is what he knew would happen or that coercion would be used in order to have what happened happen. Right. I understand your point, Your Honor. I just don't think there's any daylight in this case. I'm asking. I'm not making a point. I'm merely asking. There's no daylight in this case because he did not intend to, and there's no evidence to suggest that he intended to, cut off her viable alternatives that, in fact, existed when she got down here. What about for all the two women, A.H. and King, who he did do those things for? There's some evidence here that shortly prior to leaving for Miami, that it was clear that the way that the defendant operated was to say, we're going to starve. We're not going to have a house. You're going to starve. You're not going to have a house unless you go out on the street and do what I want you to do. But those victims, I think, were not similarly situated in the way that Juanita Barr was. Juanita Barr is a fully functioning adult woman. So was Ms. King. Ms. King was a lot younger, but also in his control. She had been working for him for many months. Juanita Barr had not spoken to Red or the defendant. If that's the M.O., though, if the M.O. is to say, we're going to starve unless you go out there and do this, and they traveled to Miami with the intent of doing the same plan or the same program, which is the word that he used, then how can a reasonable jury not conclude that that was his intent going into it, that coercion, financial coercion, would be used with regard to Ms. Barr? Because he did not take actions that would have compelled somebody. He did not intend to do that. So the action, again, to me, that's a difference between the actions, which I know you want to focus on, because what happened there may be more favorable to you of what actually happened, versus what he intended to happen, what he understood in transporting or maintaining or enticing to go down there would happen, which seems to be what the statute is directed at. Well, Your Honor, I don't think the government has made this argument, first of all. But second of all, I think when you talk about transporting, I mean, that brings up another point that I wanted to mention here, which is we're not disputing that Mr. Walker did not commit a crime in connection with Juanita Barr. We're just saying he did not commit this crime. I think that his conduct would have fallen comfortably within 2421, the transportation offense that was charged in this very case in connection with Count 3. So what we're really saying here is that however, you know, unsympathetic Mr. Walker may be, the government is overcharged on this count. They overcharge and this court shouldn't bail out the government because the text of the statute is very specific here. The court should not stretch the definition of coercion or serious harm beyond what the plain statute says. And it requires compulsion, compulsion. There is no evidence in this case that she was compelled to engage in prostitution. She decided to. That is how she wanted to earn $156 for her train ticket. And if I could just highlight three pieces of evidence that I think are very clear on this. First, her Facebook post on January 25th, the very first full day that they're in Miami, she gets on Facebook and she says, I have a goal of earning $3,000 to $5,000 in Miami. Forget about $156. She wants to make money while she's down here. And how else is she going to do that? But through prostitution, she's not working. She's not gambling. She's not playing the lottery. She's going to do this through prostitution. Second, she jumps at the very first chance she gets to do this. When the other two women say, we found some rich white guys on a yacht here. What does Juanita Barr say? She's in the car. She says, come pick me up. I want in. And she testified that she knew she would have to engage in prostitution on the boat. And Mr. Walker never told her to go. Third and finally, her behavior during the date with the undercover officer is very revealing. He testified, this is on pages 47 to 52 of docket entry 187. And he testified, she's not afraid. She's not fearful. She's not reluctant. The money's placed on the counter. She undresses. She tells him to undress. And most notably, she never says, look, I'm being forced to do this. I'm in trouble here. Help me. Get me out of here. And that is true even after she testified that she knew he was a cop. And so that goes back to my main argument here, which she has viable alternatives. She's on the phone with her mother, her sister, her best friend, Courtney. Every day of this trip, they are very close. They are very supportive. She asks her sister for $20 for food. Never says, hey, mom, hey, sis, can you spare $150? Counselor, let's go back to, this is all great. Let's go back to the intent that we were talking about before. So I'll just throw out a few of these here and like your thoughts on them. So docket entry 186 at page 168 and 169. This is a text between Mr. Walker and Ms. King. Quote, broke, yes. But we need to surface, campaign, and obtain some new O's to increase our payroll. We have the plans that won't wait. That we need more girls to work with us so we can increase whatever we wanted to do. That's from August 31st of 2019, shortly before, not terribly long before this all happens. That's the plan. That's the intent, is it not? In getting someone new to go down there to increase the payroll so that they're not broke. So, Your Honor, that I believe was perhaps from their trip to Texas. I mean, that may have been his intent at that time. His intent with respect to Juanita Barr, who was not— So you're not allowed to see that as the intent of what the quote, unquote, program is with regard to Ms. Barr? Your Honor, he didn't even know who she was before she was invited, right? I mean, this was all read. You know, but it didn't matter to him who, what the woman's name was, right? He just wanted somebody to be able to do what he wanted them to do. Your Honor, even if you're right, even if you're right about that, I still don't think it rises— I'm asking if I'm right. I don't know, but it doesn't rise to the level of coercion in this case because it doesn't fit the definition of serious harm. Just because somebody could be starving— Financial harm is serious harm. But you don't look at that in the abstract, Your Honor. You look at that from the perspective of a reasonable person in the victim circumstance. And the victim here— So let's talk about the victim circumstances. You have a young woman. I understand she was older than age. But a young woman, grew up poor with some serious family issues, moved around and had no friends, was taken to a city she didn't know without any money, without very little clothes, and originally told that she was only going to be there for a couple days, but that we're going to be there permanently. Is that not someone who is maybe subject to a little more coercion than, you know, the regular person? Perhaps so, Your Honor. But it's not pressure. It's not encouragement. It's not inducement. It's compulsion. That is the text of the statute here, right? And Congress knew the difference because if you look at the definition of— there's a different type of coercion here, an E-1, abusive legal process, and it uses the phrase exert pressure. E-5, serious harm, talks about compulsion. And Congress knew the difference there, and I think we have to respect that choice in drafting. Okay, Mr. Adler. Thank you. Thank you. You've saved five minutes for rebuttal. We'll hear next from Ms. Hernandez. Good morning, Your Honors, and may it please the court. All right. I apologize. I'm getting feedback on them. Well, you sound fine on our end. Jenny Hernandez for the United States. Are you able to hear me, Ms. Hernandez? I am. Okay. I'm just hearing myself. Okay. Well, I think you'll just have to work through it because we're not getting feedback, so give it your best. Jenny Hernandez for the United States. The counsel, Alejandra Lopez, is traveling, but she's listening to the arguments of the election. Coercion in this case is down to five factors. One, defendant's targeting of GV. Two, GV's vulnerability as a victim. Three, geographical and social isolation of GV. Three, his controlled resources. And five, his use of Confederates. Digging a little deeper into this, and looking at the defendant's planning and targeting of GV, Governments Exhibit 12D and 9A are particularly instructive. In 12D, this is on page 40 to 50, he says, if I put pressure on her, referring to Nell or GV, she will move and progress for me. This conversation dates all the way back to August of 2019, which shows that five months before the January 2020 trip, he already had his sights set on GV. Fast forwarding to January 2020, he says again in reference to Nell or GV, Nell will be better away from him. This, together with the conversations that Judge Lux cited from the record, established that yes, he absolutely wanted more women and girls in stables, but in particular, had his sights set on GV. Now, turning to Governments Exhibit 9A, this is a conversation between one person, H, the minor victim. He says, we will be in the same car and rooms for at least 30 days. Now, this is in contrast with representations that AH, on his behalf, had made to the victim, indicating that it was only going to be for a few days or a week. And importantly, the second part of this conversation, there will be no leaving, pull out, separating, or switch. Again, this reflects the fact that there will be pressure, there will be coercion. This establishes his intent to control every aspect of GV's life as she moved into Miami. And this is from page 797 of the Resolution 9A. Now, why target GV? Well, she was vulnerable. She was a vulnerable victim. She grew up one of seven. She grew up moving from Section 8 housing to Section 8 housing. She was raised by a single mother. She wasn't able to achieve higher education. That's key then to Factor 3, which is the defendant's social isolation. He took her 1,300 miles from home to a place that she had no support, no friends, no family. And then he surrounded her with his new parents. His other victims essentially acted as an extension of himself. And when he got down there, this leads us to Factor 4. He controlled the resources, transportation. He was the only one who was thriving. It was his fault. Money, all of the money that he took from SK or JB went straight to him. He controlled the food and the shelter because the hotel was under his name. And then last, his youth competitors, as I mentioned, he had his other victims, SK and HB, and AH, by the way, he started grooming her at age 15. And he knew she was, she knew, he knew that she was age, this is particularly evident in government since 17, where he says that you reference to AH, for a non-youth little girl, the first time we met, you're barely one foot. You got for three plus months before you were the KST mate. This is what he does. He is very good. He puts pressure on girls and women so that they will do exactly what he wants them to do. So what the record shows is clear targeting, a clear scheme, plan, or pattern, which the definition instructs us is something that this court absolutely can consider. And it absolutely counts in this portion. If the court has any questions, I'm happy to answer them. I don't hear any Ms. Hernandez. So we thank you for your argument. Thank you, your honors. Mr. Attler. Thank you. That was, that was great. I would like to respond to this, again, this point about pressure, okay, because that's not the word that the statute uses.  he had the right to do that. The intent to exert pressure on Juanita Barr when she came down. That is not the definition in the statute. E5, compel. That is the word. E1, exert pressure. Different theory, not an issue in this case. So our position here, again, is that there is no compulsion where there are viable alternatives, literally at her fingertips. A couple of presses of a button, text to sis, call mom on one of these calls that she's talking to her mother. Hey mom. Again, counsel, that seems to focus on what actually happened as opposed to what he knew, whether he knew that coercion would be used against her. Whether it, coercion was actually used, whether she had options to get out, seems to not be, not irrelevant, but not exactly what the element is going for. But your honor, I think at best, it shows that he intended to exert pressure, not that he intended to compel her, to give her no other alternative. Because I think if you compare the facts of this case with Purcell, the Second Circuit, this is the case that leads to that dramatic escape, barefoot running into the Pennsylvania winter, because he had, the defendant in that case had an MO, where he would brand his victims with neck tattoos, where he would make them use the bathroom with the door open, no eye contact with individuals, controlled exactly where they ate. He slept with their phones. He made her change her phone number. That was an MO. The MO here though is, you're going to starve, and we're not going to have a home, unless you do what I tell you to do. She only wouldn't have a home, and she would only starve, if he took her phone and prevented her from contacting her supporting family members. You've changed the thing. It's, I'm talking about the MO. The MO is, I mean, you look, the text messages between him and A.H. and him and Ms. King are, that if you don't do this, we will starve. We will not have a home. You can't live here anymore. Those victims were not similarly situated as Juanita Barr was. He had full control over them. They lived with him. He provided them shelter, resources, everything. Juanita Barr was not in a sexual relationship, like Red was with Mr. Walker. Mr. Adler, I wonder whether though, the evidence that becomes a jury issue about compulsion, really requires the, no other alternative kind of proof that you're suggesting. If it could be that calling a family member and asking to wire money, at least in the term, in the mind of the victim, it is for whatever reason, really not something that is a viable alternative. I mean, you suggest that that could have been done, but couldn't it be that the jury could reasonably infer that the victim reasonably thought that was not a viable alternative? I think in some cases, whether an alternative is viable is going to be a jury question. If she had no mother, no sister, no support at all, nobody she could talk to, if she didn't have a friend who was an FBI agent, who she didn't call, if she wasn't in Miami for a Super Bowl, where there was heavy police presence with cops on every corner, with an interagency task force devoted to sex trafficking, if she couldn't have called 911, et cetera, then yes, that may be a jury question, but it wasn't in this case where the most obvious alternative, something that is so reasonable that anybody in her situation. Someone who's engaged in prostitution might not think that going to law enforcement is a great alternative. Well, she denied being involved in prostitution before this trip, and she had a personal friend who was in the FBI. She never contacted him. All I'm saying is that if you're right, Your Honor, then any person involved in that situation really never go to law enforcement. And what we're doing here is if you affirm the conviction in this case, I think you're setting a dangerous precedent where, and remember, this statute can be applied to 15-year mandatory minimum, not just to low-level, unsympathetic pimps like Mr. Walker, but to high-profile individuals, celebrities, actors, politicians who engage, who use escort services. So if we have an escort who finds herself in a difficult situation, decides to commit prostitution, later says she was forced to do it, now prosecutors, the Justice Department, has a 15-year mandatory minimum that they can leverage to extract guilty pleas. Does your argument depend on the notion, though, that the government has to prove not just that the defendant took away substantial freedom from her, but just totally deprived her of any freedom, and it is only in that circumstance that it can satisfy its burden of proving compulsion? I think I'm using the word compel in its ordinary meaning, which is you have no reasonable alternative. Not no alternative, like if we're saying she had to hitchhike 1,000 miles, that wouldn't necessarily be reasonable. But in this situation, where all she has to do during one of her calls with her mom or her sister, and I mean, she downplayed the cost of the train ticket to her sister. She said it was nothing, 156 bucks, that's nothing. She wanted to make a lot more money on this trip, so under the circumstances of this particular case, it just doesn't rise to the level of compulsion, even if, Judge Luck, you're right, even if he had an M.O. or an intent to exert pressure on people like her. Even if she was susceptible to that pressure, she still was not compelled to commit prostitution. She decided to commit prostitution, and for those reasons, we would urge the court to just follow the text of this statute and reverse the conviction on count one. Thank you, Mr. Radler. Thank you, Mr. Radler. We'll go to the next case, Chewy, Inc. vs.